[Cite as *In re H.H.*, 2022-Ohio-3575.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| H.H., C.G., N.G. | : | Appellate Case No. 2022-CA-30 |
| | : | |
| | : | Trial Court Case Nos. 20190712 & |
| | : | 20190713 |
| | : | |
| | : | (Appeal from Common Pleas |
| | : | Court – Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of October, 2022.

. . . . . . . . . . .

IAN A. RICHARDSON, Atty. Reg. No. 0100124, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee, CCDJFS

TRAVIS KANE, Atty. Reg. No. 0088191, 130 West Second Street, Suite 460, Dayton, Ohio 45402
      Attorney for Defendant-Appellant, Father

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant "Father" appeals from a judgment of the Clark County Court of Common Pleas, Domestic Relations Division, which terminated his parental rights to minor children H.H., C.G., and N.G. and awarded permanent custody of the children to Clark County Department of Job and Family Services (CCDJFS). Father filed a timely notice of appeal on April 28, 2022.[1]

{¶ 2} On September 5, 2019, CCDJFS filed a complaint and request for shelter care alleging that H.H., C.G., N.G., and E.W. were dependent children. The complaint also alleged that the four children were removed from the home of Mother and Father because of deplorable living conditions, neglect, and allegations of sexual and physical abuse. Notably, Father was thereafter charged with and pled guilty to child endangerment.

{¶ 3} Mother is the biological mother of H.H., C.G., N.G., and E.W. Father is the biological father of C.G. and N.G., and he is stepfather to H.H. and E.W.[2] On October 15, 2019, a guardian ad litem (GAL) was appointed by the trial court to represent the best interests of the children. On October 17, 2019, CCDJFS filed a case plan for Mother and Father to eventually be reunited with the children.

{¶ 4} After the GAL filed an initial report on November 1, 2019, the trial court awarded temporary legal custody of the children to CCDJFS. Mother and Father were granted supervised visits with the children. At the time of the hearings in this matter, H.H. was 13 years of age with no developmental delays; C.G. was seven years old and

---

[1] Mother's parental rights were also terminated, but she did not appeal from the trial court's judgment.

[2] E.W. is not involved in this case due to sexual abuse allegations made against him.

completely non-verbal with multiple physical and intellectual delays; and N.G. was four years old with some developmental delays.

{¶ 5} On July 21, 2020, Father filed a "Petition for Legal Custody" of the children. On July 31, 2020, CCDJFS filed a motion for an extension of temporary legal custody of the children. On September 16, 2020, a magistrate issued a decision extending temporary custody of the children to CCDJFS. On October 26, 2021, legal custody of H.H. was awarded to Mother and Father. On December 15, 2021, both C.G. and N.G. were returned to the custody of Mother and Father pursuant to a one-year protective order of supervision issued by the magistrate.

{¶ 6} On May 18, 2021, the GAL filed a motion requesting that emergency custody of the children be granted to CCDJFS because there were concerns that Mother had inappropriately exposed H.H. to adult men on the internet. The GAL was also concerned about Mother's and Father's parenting abilities and their abilities to meet the medical and educational needs of the children. On May 19, 2021, the magistrate ordered Mother to vacate the family residence and only have supervised contact with the children thereafter. Interim custody of the children was awarded to Father.

{¶ 7} On August 5, 2021, CCDJFS filed a motion requesting that legal custody of the children be awarded to Father. One day later, the GAL filed an emergency motion requesting that interim temporary custody of the children be awarded to CCDJFS. The magistrate granted the GAL's motion on August 12, 2021, and awarded temporary custody of the children to CCDJFS. On August 16, 2021, Father filed a motion requesting legal custody of the children. On August 19, 2021, CCDJFS filed a motion

requesting permanent custody of all three children. On September 13, 2021, CCDJFS filed a motion to terminate visitation between Father and the children. The magistrate granted CCDJFS's motion to terminate visitation on September 15, 2021.

{¶ 8} Evidentiary hearings were held before the trial court on December 20, 2021; February 18 and 22, 2022; and March 9, 2022.

{¶ 9} Leslie Vasquez, a CCDJFS caseworker for the children, testified that she observed problems with Father's parenting ability throughout the pendency of the case. Specifically, Vasquez described Father as an "obstructionist" who refused to follow the suggestions of the parent aide who was present in the home to make observations and offer advice. 12/20/21 Tr. 28. Vasquez testified that the yard at the residence was often overgrown and filled with trash and other equipment; she testified that the yard was eventually cleared, but she would periodically observe trash and empty soda cans in the driveway. Vasquez also testified that while the living conditions inside the residence were not "deplorable," it was "oftentimes cluttered, somewhat dirty." *Id.* at 33.

{¶ 10} Vasquez testified that Father believed that none of the children required specialized medical care and/or therapy. Specifically, Vasquez testified that Father was entirely unsupportive regarding C.G.'s speech therapy needs and his use of a special device to aid in the therapy. Vasquez testified that on several occasions, C.G. would fail to bring his speech therapy device to his appointments, and Mother and Father would misplace the device at home. Father informed Vasquez that he "did not see a lot of value" in the device despite being told on multiple occasions that C.G. needed the device to aid in his speech therapy. *Id.* at 50.

{¶ 11} Additionally, Kayla Welling, C.G.'s speech therapist throughout the case, testified that when C.G. was under Father's exclusive care from June 2021 to August 2021, C.G.'s speech therapy device was simply "missing for a good chunk of time." 2/22/22 Tr. 113. Welling testified that Father had not been engaged and receptive during C.G.'s speech therapy appointments and had not been helpful when it came to C.G.'s learning how to use the speech device. Welling testified that Father had informed her that he did not believe the device was necessary. Welling unequivocally testified, however, that the device was medically necessary to treat C.G.'s speech problems. Welling also testified that C.G.'s attendance at the therapy appointments had been "spotty" and that he had appeared disheveled and dirty on several occasions. *Id.* at 102. Welling testified that, at time of the hearing, C.G. was still unable to speak. Father also did not follow specific dietary recommendations in regard to C.G. to ensure that the child grew properly and gained weight. Because of his significant developmental delays, C.G. still wore a diaper at the time of the hearings and would most likely never be able to speak properly, if at all.

{¶ 12} Evidence was also adduced that Father had difficulty providing the children with adequate transportation. Specifically, Vasquez testified that Mother and Father did not attempt to rectify the transportation situation until it was discovered that H.H.'s grades at school had dropped dramatically. Mother was eventually able to get her driver's license, but Father refused to put her on his car insurance plan until the trial court ordered him to do so. Father also did not attend couples counseling or conflict resolution classes.

{¶ 13} Sierra Errett, another CCDJFS caseworker, testified that the agency was

concerned that Father had not been able to maintain stable employment and care for the children at the same time. Father was not employed during the summer of 2021 because, while he was working, he was unable to provide daycare for the children and/or transport them to their various appointments. Furthermore, Vasquez testified that H.H. had only sporadically attended her counseling sessions and had not been provided with her psychiatric medication until Vasquez told Mother and Father that they had to provide for H.H.'s medical needs in that regard. By his own admission, Father failed to prevent H.H. from having access to her cellphone even after the trial court had ordered him to limit her access to technology.

{¶ 14} Vasquez testified that, although N.G. was determined to obtain speech therapy, the child had been dropped from the program due to nonattendance because neither Mother nor Father was able to provide reliable transportation. While Father was the main provider of transportation for the children, he failed in this regard when he was working. Vasquez testified that CCDJFS attempted to provide Father and the children with transportation and gas cards, but Father still struggled to transport the children to their appointments.

{¶ 15} Errett testified that Father also had a hostile relationship with the children's foster parents. Errett testified that the foster parents had reported Father's following them in his vehicle after visitation with the children. Furthermore, Father had called the police and reported that the children were being abused by the foster parents without any evidence to support his allegations.

{¶ 16} In light of the evidence adduced at the hearings, the trial court found that

Father was unable to meet the basic needs of the children, terminated his parental rights, and granted CCDJFS's motion for permanent custody of H.H., C.G., and N.G.

{¶ 17} Father now appeals.

{¶ 18} Father's sole assignment of error is as follows:

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO CLARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES.

{¶ 19} Father contends that the trial court erred when it terminated his parental rights and granted CCDJFS's motion for permanent custody of H.H., C.G., and N.G. Specifically, Father argues that CCDJFS "failed to prove by clear and convincing evidence that it was in the children's best interests to be placed in the permanent custody of CCDJFS." Appellant's Brief, p. 8.

{¶ 20} The United States Supreme Court has described the interest of parents in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Ohio Supreme Court has recognized that "there is an essential and basic civil right to conceive and raise children." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39. However, "[t]he fundamental interest of parents is not absolute." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Probate Div.*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 58

(O'Connor, C.J., dissenting), citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28.

{¶ 21} The termination of parental rights is governed by R.C. 2151.414. R.C. 2151.414(B)(1) requires a court to determine, "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody" and that certain other conditions apply. Clear and convincing evidence has been defined as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases,' " and which will produce in the mind of the trier of fact " 'a firm belief or conviction as to the facts sought to be established.' " *In re K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 22} A court's decision to terminate parental rights will not be overturned "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "We review the trial court's judgment for an abuse of discretion." *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 14, citing *In re C.F.* at ¶ 48 (applying the abuse-of-discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 23} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute

requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. *In re L.W.*, 2d Dist. Montgomery No. 26243, 2014-Ohio-4507, ¶ 11, citing R.C. 2151.414(B)(1).

{¶ 24} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (b) the wishes of the child; (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. "No one element is given greater weight or heightened significance." *In re C.F.* at ¶ 57.

{¶ 25} R.C. 2151.414(E) further provides in pertinent part:

(E) In determining at a hearing held pursuant to division (A) of this section

or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home

for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter,

and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

* * *

(16) Any other factor the court considers relevant.

{¶ 26} It is undisputed that the children entered into the shelter care custody of CCDJFS on September 5, 2019, and were adjudicated dependent on October 10, 2019. On November 5, 2019, the children were placed in the temporary legal custody of CCDJFS. The record establishes that H.H. was returned to the custody of Mother and Father on October 26, 2020, and C.G. and N.G. were returned to the custody of their parents on December 15, 2020. All of the children were again removed from their parents' custody on August 12, 2021, and placed in the temporary custody of CCDJFS, where they remained until the trial court's decision. Therefore, from the adjudication of dependency through CCDJFS's filing of its motion for permanent custody, H.H. was in the temporary custody of CCDJFS for 12 of 22 months. C.G. and N.G. were in the temporary custody of CCDJFS for approximately 14 of 22 months. Accordingly, the trial court did not err when it found that the children had been in the custody of CCDJFS for 12 of 22 months as required pursuant to R.C. 2151.414(B)(1)(d).

{¶ 27} Father did comply with several of his case plan objectives: 1) he participated in a drug and alcohol assessment; 2) he participated in "parenting psychological;" 3) he completed a mental evaluation; 4) he maintained employment sporadically during the pendency of the case; 5) he visited the children regularly when permitted; 6) he signed

releases of information; 7) he maintained a residence for the children, although the house was described as "dirty;" and 8) he submitted to a drug screen. As previously stated, however, Father failed to attend couples counseling or conflict resolution classes. Father also failed to prevent H.H. from having a cellphone in violation of the trial court's order.

{¶ 28} Furthermore, Vasquez testified that she observed problems with Father's parenting ability throughout the case. Specifically, Vasquez described Father as an "obstructionist" who refused to follow the suggestions of the parent aide who was present in the home to make observations and offer advice. Vasquez also testified that Father believed that none of the children required specialized medical care and/or therapy. Specifically, Vasquez testified that Father was entirely unsupportive regarding C.G.'s speech therapy needs and his use of a special device to aid in the therapy; on several occasions, C.G. would fail to bring his speech therapy device to his appointments, and Mother and Father would misplace the device at home. Father informed Vasquez that he "did not see a lot of value" in the device despite being told on multiple occasions that C.G. needed the device to aid in his speech therapy.

{¶ 29} Welling, C.G.'s speech therapist, testified that when C.G. was under Father's exclusive care in the summer of 2021, C.G.'s speech therapy device was simply "missing for a good chunk of time." Welling testified that Father was not engaged and receptive during C.G.'s speech therapy appointments and was not helpful when it came to C.G's learning how to use the speech device. Welling testified that Father informed her that he did not believe the device was necessary. Welling, however, testified that the device was medically necessary to treat C.G.'s speech problems. Welling also

testified that C.G.'s attendance at the therapy appointments was "spotty" and that he appeared disheveled and dirty on several occasions. Father also failed to follow specific dietary recommendations in regards to C.G. to ensure that the child grew properly and gained weight.

{¶ 30} There was also evidence that Father had difficulty providing the children with adequate transportation to school and appointments. Specifically, Vasquez testified that Mother and Father did not attempt to rectify the lack of transportation to school until it was discovered that H.H.'s grades at school had dropped dramatically. Mother was eventually able to get her driver's license, but Father refused to put her on his car insurance plan until the trial court ordered him to do so. The record also establishes that Father was not employed during the summer of 2021 because he was unable to provide daycare for the children and/or transport them to their various appointments while he was working. Furthermore, Vasquez testified that H.H. only sporadically attended her counseling sessions and was not provided with her psychiatric medication until Vasquez told Mother and Father that they had to provide for H.H.'s medical needs in that regard.

{¶ 31} Even though N.G. was found to require speech therapy, the child was dropped from the program due to nonattendance because neither Mother nor Father were able to provide reliable transportation. While Father was the main provider of transportation for the children, he failed in this regard when he was working or otherwise employed. Vasquez testified that CCDJFS attempted to provide Father and the children with transportation and gas cards, but Father still struggled to transport the children to their appointments.

{¶ 32} Errett, another CCDJFS caseworker, testified that Father also had a hostile relationship with the children's foster parents. Errett testified that the foster parents reported that Father had followed them in his vehicle after visitation with the children. Furthermore, Father called the police and reported that the children were being abused by the foster parents without any evidence to support his allegations.

{¶ 33} Conversely, the foster parents hoped to adopt all three children and would welcome H.H.'s return to their care.[3] The foster parents were meeting C.G. and N.G.'s educational, medical, and emotional needs and following all of the recommendations made by CCDJFS and the children's therapists. The foster parents initiated services for C.G. for his developmental disabilities, genetic testing for C.G., and counseling for N.G. By all accounts, C.G. and N.G. were thriving under the care of their foster parents, and there was no evidence that the children were being mistreated while in their custody.

{¶ 34} The record establishes that CCDJFS made every effort to reunite Father with the children. Father's actions throughout these proceedings, however, established that he was either unwilling or incapable of adequately caring for the specialized medical and physical needs of the children, especially C.G., who will clearly require a high level of care for the rest of his life. Notably, the GAL also recommended that CCDJFS be awarded permanent custody. Accordingly, we find that the trial court did not err when it found that clear and convincing evidence was adduced at the permanent custody hearings which supported its decision to award permanent custody of the children to CCDJFS and to terminate Father's parental rights.

---

[3] At the time the trial court issued its decision granting CCDJFS permanent custody of the children, H.H. was living in a separate foster home from her other two siblings.

**{¶ 35}** Father's sole assignment of error is overruled.

**{¶ 36}** Father's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

Ian A. Richardson
Travis Kane
Dawn Garrett
Sara Barry
Hon. Katrine Lancaster